RALPH H. JACKSON AND MARY J. JACKSON (HUSBAND AND WIFE), PETITIONERS, ET AL.,[1] *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 91780–91789, 95796–95798, 96225–96226, 96592.

Promulgated December 13, 1939.

---

[1] Proceedings of the following petitioners are consolidated herewith: Otis Hutchins; George H. Huntley and Estella D. Huntley (Husband and Wife); Henry P. Kirchner; Henry R. Power and Mary M. Power (Husband and Wife); Frank L. Buell and Emma A. Buell (Husband and Wife); Boyd H. Work and Jean E. Work (Husband and Wife); Ernest R. Baxter and Ethel A. Baxter (Husband and Wife); Lee P. Allen and Naomi S. Allen (Husband and Wife); Harry C. Martin; Charles F. Geiger and Catherine M. Geiger (Husband and Wife); Edwin B. Forse; Boyd M. Johnson; Carl J. Steuber; William J. Ulrich; Irving Joseph Hawke.

*F. E. Gleach, Esq.*, and *H. A. Mihills, C. P. A.*, for the petitioners
*Harold F. Noneman, Esq.*, for the respondent.

OPINION.

LEECH: These consolidated proceedings seek redetermination of deficiencies in income tax as follows:

| Name | Docket No. | Year | Deficiedcy |
|---|---|---|---|
| Ralph H. Jackson *et ux* | 91780 | 1935 | $414.48 |
| Otis Hutchins | 91781 | 1935 | 1,334.49 |
| George H. Huntley *et ux* | 91782 | 1935 | 769.05 |
| Henry P. Kirchner | 91783 | 1934 | 1,074.76 |
|  |  | 1935 | 891.26 |
| Henry R. Power *et ux* | 91784 | 1935 | 1,107.05 |
| Frank L. Buell *et ux* | 91785 | 1934 | 457.13 |
| Boyd H. Work *et ux* | 91786 | 1935 | 206.27 |
| Ernest R. Baxter *et ux* | 91787 | 1934 | 62.62 |
| Lee P. Allen *et ux* | 91788 | 1934 | 180.01 |
| Harry C. Martin | 91789 | 1935 | 1,743.72 |
| Charles F. Geiger *et ux* | 95796 | 1935 | 400.62 |
| Edwin B. Forse | 95797 | 1935 | 2,660.78 |
| Boyd M. Johnson | 95798 | 1935 | 395.96 |
| Carl J. Steuber | 96225 | 1935 | 1,561.09 |
| William J. Ulrich | 96226 | 1935 | 1,187.50 |
| Irving Joseph Hawke | 96592 | 1935 | 766.35 |

The common issue is whether, under section 165 of the Revenue Act of 1934, the excess of the value of certain stock in the Carborundum Co. upon the dates of its distribution pursuant to a trust agreement, over the amounts paid in by petitioners, is properly includable in petitioners' income. The parties have submitted the proceedings on a stipulation of facts to which exhibits are attached and both the stipulation and exhibits are incorporated herein as our findings of fact.

All of the petitioners are employees of the Carborundum Co., a corporation. On September 18, 1928, the board of directors of the Carborundum Co. resolved to increase the company's capitalization from 500,000 shares to 525,000 shares. The stated capital applicable to the increase was to be $1,250,000; but the shares were to be without par value. This action was approved at a special meeting of the stockholders of the company on September 11, 1928. On the same day the board of directors met and resolved that, of the 25,000 shares authorized to be issued, 12,500 shares should be sold at $50 a share and that the remaining 12,500 shares should remain unissued for the present. It was further resolved that the officers of the Carborundum Co. be authorized to execute a certain trust agreement involving the sale of 12,500 shares of the Carborundum Co. to trustees at $50 per share.

This trust agreement was executed on November 28, 1928, between the Carborundum Co., Power City Bank as lienor, and three trustees. The trustees were Frank J. Tone, George R. Rayner, and Frank H. Manley, all of them stockholders of the Carborundum Co. The preamble of the agreement recited that the Carborundum Co., hereinafter referred to as "the company", desired to create a trust in 12,500 shares of the company's capital stock "as a part of a profit-sharing plan for the exclusive benefit of some of the employees of the company, or of its subsidiaries, to which plan contributions are to be made by such employees for the purpose of distributing to such employees the earnings and principal of the fund to be accumulated by the trust." In the operative part of the agreement, the trustees agreed to receive and accept the 12,500 shares of the company's stock as and when issued to them in trust, and to hold the same and receive the dividends thereon for the benefit of the company's employees pursuant to a plan which was then set forth in the body of the trust instrument. This plan was embodied in a letter set out in the trust instrument. The substance of the letter was that the stock was to be offered to certain employees at $50 per share and to be paid for by them in small monthly installments in limited maximum amounts.

It was further provided in the trust instrument that whenever an employee should fully pay up the balance owing on the stock which he desired to purchase under the plan, the trustees would obtain the stock which he was purchasing and would thereupon distribute it to him or to his personal representatives if he were dead. If one of the participants should cease to be employed by the company or if he desired to withdraw from the plan, the trustees would thereupon refund to him the amount of all payments already credited against the purchase price. The participants were to pay interest on the unpaid balance of the purchase price, plus the proportionate part of the trustees' actual expenses allocable to each of them. The trustees were authorized to pledge the entire block of 12,500 shares with the lienor to secure the repayment of amounts borrowed by the trustees from the lienor to cover the unpaid balances due to participants on their purchases of stock under the plan. The trustees were further authorized to vote the stock held by them under the trust and to otherwise deal with it as if they were absolute owners.

Eighty-one employees of the company and its subsidiaries executed the "offer to purchase stock."

When the trustees received offers to purchase stock, they borrowed money from the Power City Bank (lienor under the trust agreement) in an amount sufficient, when added to the initial payments of the participants, to purchase the required number of shares of stock from the company at $50 per share. The company thereupon issued the stock

and credited $20, for each share so issued, to its capital stock account and the remainder of the proceeds for each share, $30, to its paid-in surplus account. A total of 9,265 shares out of the 12,500 shares made available under the plan were purchased from the company, the balance remaining unissued. When the purchase price of the stock, interest payable, and expenses had been paid, by deducting amounts necessary from the salary of the purchaser together with dividends paid on the stock, the stock certificate covering the number of shares purchased was delivered. When an employee requested release from his offer to purchase stock, his payments were ordinarily refunded. The offers to purchase stock by petitioners, the number of shares they contracted to buy, the initial payment per share, the deduction per share from salary, the date of distribution of the stock, the number of shares distributed, payments by the petitioners, the dividends credited, and the interest and transfer tax charged, the fair market value of the stock received by the petitioners at all dates material thereto in 1934 and 1935, are stipulated.

All of the petitioners, with the exception of Hutchins, Allen, Buell, and Jackson, in making their respective Federal income tax returns, included in income on account of the distribution of this stock, only the dividends declared thereon and credited on the purchase price thereof. Hutchins failed to include dividends so declared and credited, to the extent of $600. Buell, Allen, and Jackson failed to report any amount on account of dividends declared or credited. The parties have also stipulated that the dividends declared on the stock distributed pursuant to the agreement and which were credited on the purchase price thereof are properly includable in income in the year in which distribution of the stock was made.

The Carborundum Co. and its subsidiaries claim no deductions in their respective corporate Federal income tax returns for the years 1934 and 1935 for compensation paid to petitioners on account of the dividends declared and credited upon the purchase price of their stock, or for the difference between the purchase price of $50 per share and the fair market value of the stock purchased by petitioners and distributed to them in the years 1934 and 1935. The company, however, has filed claims for refund, which are still pending, asking refunds on the ground that the company should have taken such deductions.

During the taxable years here involved, the company paid bonuses in cash in addition to stated wages and salaries. In 1934, a total of $23,665.44 was so paid, and in 1935 a total of $36,796.35 was so paid.

Respondent seeks to tax petitioners on the difference between the value of the Carborundum Co. stock when distributed to them and the amounts paid in by the petitioners in order to acquire the stock. He predicates his action on section 165 of the Revenue Act of 1934, which

is set out in the margin.[2] Petitioners' answer to this contention is, first, that no trust was created as a part of a profit-sharing plan, and, second, that even if there were a plan it could not be for the sharing of profits in the sense in which that word is used in the statute, because dividends received on an investment in stock do not constitute statutory profit-sharing.

Having regard to the literal wording of the statute, it does not seem to us to be open to question that the trust created by the Carborundum Co. is precisely covered by section 165. The preamble of the trust contains the statement that it was the desire of the company to set up the trust as a part of a profit-sharing plan for the exclusive benefit of certain of its selected employees. Petitioners urge that the trust was not created as a part of such plan for the reason that the language of the trust instrument in this regard is merely precatory. In support of their contention they cite *Herbert G. Goulder*, 39 B. T. A. 670. Petitioners also urge that no stock was conveyed in trust and that the trust therefore lacked a *res*.

Answering the second contention first, it is very plain that the Carborundum Co. did convey the stock to the trustees. It is true that the stock was not issued except as each employee completed the payments due by him, but inasmuch as the trustees were given power to pledge and vote the entire block of stock and since that stock could not be used by the company for any other purpose during the term of the trust agreement, we think the rights of the trustees in that block of stock were sufficiently substantial to constitute a trust *res* and thus support the trust. See *Carson Estate Co.*, 31 B. T. A. 607; affd., 80 Fed. (2d) 1007.

In regard to petitioners' argument that the trust was not created as a part of a plan, we do not think that section 165 requires that the words "profit-sharing plan" be included in the operative clause of the trust agreement. It is evident from the corporate resolutions, the entire trust agreement, and the evidence that such a plan was both contemplated and carried out. It is worthy of emphasis that the statute covers a trust "for the purpose of distributing to such employees the earnings and principal of the fund accumulated by the trust in accordance with such plan." This purpose is indicated by the

---

[2] SEC. 165. EMPLOYEES' TRUSTS.

A trust created by an employer as a part of a stock bonus, pension, or profit-sharing plan for the exclusive benefit of some or all of his employees, to which contributions are made by such employer, or employees, or both, for the purpose of distributing to such employees the earnings and principal of the fund accumulated by the trust in accordance with such plan, shall not be taxable under section 161, but the amount actually distributed or made available to any distributee shall be taxable to him in the year in which so distributed or made available to the extent that it exceeds the amounts paid in by him. Such distributees shall for the purpose of the normal tax be allowed as credits against net income such part of the amount so distributed or made available as represents the items of dividends and interest specified in section 25 (a).

trust instrument in both the preamble and body of the trust, and the trustees are authorized to act only in pursuance of the purposes for which the agreement was drawn. The Carborundum Co. did not merely "desire" to carry out a profit-sharing plan, but actually did so.

The *Goulder* case and the state authorities cited by petitioners are distinguishable because in all those cases the operative parts of the respective instruments failed to carry out the desires and wishes expressed in their preambles.

It is the plain intendment of section 165 that the amount actually distributed or made available to any distributee, pursuant to a plan of profit-sharing, shall be taxed to the distributee in the year of distribution to the extent that the amount of the distribution exceeds the amounts paid in. The amounts of these distributions were, of course, the respective values of the stocks distributed at the times of distribution. *Schaefer* v. *Bowers*, 50 Fed. (2d) 689. See *Oscar A. Olstad*, 32 B. T. A. 670, 675. Petitioners also contend that the plan of the Carborundum Co. could not possibly be one of profit-sharing, in that it merely afforded to employees the same opportunities to purchase stock as would be granted to any member of the public and that dividends received on a stock investment are not the type of profits contemplated by the statute. They cite *Durkee* v. *Welch*, 49 Fed. (2d) 339. The *Durkee* case, it is true, removed a taxpayer from the operation of section 219 (f) of the Revenue Act of 1926 (substantially identical to section 165 of the 1934 Act) on the ground that he was merely an investor in the stock of a company and that the dividends from such investment did not constitute profit-sharing. But there was no employees' trust involved there and, furthermore, the case followed as a precedent the lower court's decision of *Schaefer* v. *Bowers*, which was reversed on appeal. (See *infra*.)

In any event, we think that *Schaefer* v. *Bowers, supra*, disposes of petitioners' contention. In that case, the employee's ultimate receipt of the stock depended on his continuance in the employ of the company for a definite period of time. The situation here is the same, for the plan as set out in the trust instrument provides that the participating employee may make monthly contributions only up to a certain amount, and that if his employment is terminated he will receive his contributions back. In other words, before he can get the stock, he must work until the sum of the maximum payments he is permitted to make out of his wages equals the purchase price of the stock he has agreed to buy. It is this feature which, as the court held in the *Schaefer* case, differentiates petitioners from ordinary purchasing investors and makes them taxable under section 165.

In view of our conclusion that these petitioners all fall within section 165, and are taxable to the extent that the value of their stock at

the time of distribution exceeds the amounts contributed by them, we do not now need to consider the alternative grounds for taxing them under section 22 (a) of the Revenue Act of 1934. Because of the concession by four of the petitioners that they have taken erroneous deductions in their returns as filed,

*Decisions will be entered under Rule 50.*